IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 24-cv-01725-PAB-STV

MICHAEL LENZ, PHD,

     Plaintiff,

v.

STEPHANIE FUJII, in her individual and official capacities, and
CHERYL CALHOUN, in her individual and official capacities,

     Defendants.

_____

**ORDER**
_____

The matter before the Court is Defendants' Motion to Dismiss First Amended
Complaint [Docket No. 27].  Plaintiff Michael Lenz filed a response, Docket No. 28, and
defendants replied.  Docket No. 29.  The Court has jurisdiction pursuant to 28 U.S.C.
§ 1331.

## I.  BACKGROUND[1]

For three years, Michael Lenz worked as a professor of political science at
Arapahoe Community College ("ACC").  Docket No. 19 at 1, ¶ 1.  ACC is part of the
Colorado Community College System.  *Id.* at 4, ¶ 12.  The Colorado Community College
System is governed by the State Board for Community Colleges and Occupational
Education (the "Board").  *Id.*, ¶ 13.  The Board has the authority to adopt policies, rules,
and regulations for the organization and operation of the Colorado Community College

_____

[1] The following facts are taken from the First Amended Complaint, Docket No.
19, and are presumed true for the purpose of ruling on the motion to dismiss.

System.  *Id.*, ¶ 14.  The Board has delegated to the presidents of individual community colleges the authority to approve all personnel actions.  *Id.*, ¶ 16.

New professors hired to work at ACC have provisional status.  *Id.*, ¶ 18.  If provisional professors complete three years of provisional employment and are hired for a fourth year, those professors receive non-provisional status, i.e. tenure.  *Id.* at 4–5, 6, ¶¶ 20, 33.  Pursuant to Board policy, a "provisional employee shall be non-renewed at the end of the provisional period unless the college president approves removal from provisional status."  *Id.* at 5, ¶ 22.  It is also Board policy that a college president's non-renewal decision of a provisional professor's contract is not subject to review.  *Id.*, ¶ 23.  Under ACC's policies and procedures, the provisional professor's supervisor provides a recommendation to the vice president of ACC regarding whether a faculty member should be removed from provisional status.  *Id.* at 6, ¶ 29.  The vice president then provides a formal recommendation to the college president.  *Id.*, ¶ 30.

Stephanie Fujii began her tenure as the president of ACC on July 12, 2021.  *Id.* at 10, ¶ 61.  Cheryl Calhoun became ACC's vice president and provost on February 1, 2022.  *Id.* at 22, ¶¶ 142–143.

ACC hired Professor Lenz in August 2019 on a provisional contract.  *Id.* at 7, ¶¶ 39–40.  Professor Lenz was a high performer during his three years of teaching at ACC.  *Id.*, ¶ 43.  Professor Lenz received exemplary performance ratings for the 2019– 2020 and 2020–2021 academic years.  *Id.* at 8, ¶¶ 46–47.  During these academic years, Professor Lenz received positive student feedback.  *Id.* at 7–8, ¶¶ 45, 48. Professor Cheyne Bamford supervised Professor Lenz and was also Professor Lenz's department chair.  *Id.* at 7, 12, ¶¶ 42, 76.  In Professor Lenz's 2019–2020 performance

evaluation, Professor Bamford noted that Professor Lenz's "teaching expertise is well-respected," that he "is clearly motivated to provide service to the college, and frequently participates in college activities," and that "his many contributions to student success and institutional service" were appreciated. *Id.* at 7, ¶ 44.

On March 7, 2022, Professor Bamford submitted a recommendation that Professor Lenz's contract be renewed and that he be granted non-provisional status. *Id.* at 29, ¶ 192. In the recommendation, Professor Bamford noted that Professor Lenz had received exemplary performance evaluations, stellar student evaluations, and strong student success rates. *Id.*, ¶ 193. On March 11, 2022, Vice President Calhoun was contacted about the need to make recommendations for faculty non-renewals and whether to grant professors at the end of their provisional period non-provisional status. *Id.* at 33, ¶ 226. Vice President Calhoun was given a spreadsheet listing the provisional faculty up for review. *Id.*, ¶ 228. Professor Lenz was identified in the spreadsheet as "Non-Provisional Pending VP Approval." *Id.* at 34, ¶ 230. On March 28, 2022, Professor Bamford informed President Fujii and Vice President Calhoun that past precedent at ACC for over 30 years had been to grant non-provisional status to high-performing faculty like Professor Lenz. *Id.* at 36, ¶ 252. On May 12, 2022, Vice President Calhoun sent her recommendations about faculty retention to President Fujii. *Id.* at 41, ¶ 285. Vice President Calhoun recommended that ACC not renew Professor Lenz's contract. *Id.*, ¶ 286. Soon thereafter, President Fujii accepted Vice President Calhoun's recommendation not to renew Professor Lenz's contract. *Id.* at 44, 47, ¶¶ 311, 335. On May 19, 2022, President Fujii notified Professor Lenz that his contract

would not be renewed, that he would not be granted non-provisional status, and that his employment at ACC would end on July 31, 2022.  *Id.* at 48, ¶¶ 336–37.

At the beginning of Professor Lenz's final semester, on January 13, 2022, Professor Lenz emailed all ACC employees expressing concerns about how the college was responding to the COVID-19 pandemic.  *Id.* at 18, ¶¶ 118–19.  In his email, Professor Lenz stated that it was "unconscionable" that administrative leaders were rejecting faculty members' requests to remain teaching online during the upcoming semester because ACC had admitted that conditions for a safe return to campus were "highly questionable."  *Id.* at 18–19, ¶ 119.  Professor Lenz also asserted that there were "numerous holes" in ACC's requirement that unvaccinated professors test for COVID-19 infection every week.  *Id.*  First, he argued that the policy was unconstitutional.  *Id.*  Second, he maintained that the CDC had determined that both vaccinated and unvaccinated individuals have the potential to spread the coronavirus and that, therefore, requiring only unvaccinated faculty to complete weekly testing was inequitable.  *Id.*

Some of Professor Lenz's colleagues reacted negatively to his email.  *Id.* at 19– 20, ¶ 122.  For example, the dean of health and public services responded to the email in a message stating "Michael Lenz is disseminating myths and misinformation" and that "his argument verges on insubordination and it is unfortunate that he emailed all college employees."  *Id.* at 20, ¶ 123.  The associate vice president and dean of business, technology, and workforce partnerships agreed and wrote a message stating, "[y]es, what he did goes way beyond academic freedom and I hope there are consequences and I will stand behind whatever we need to do.  He does not represent this institution's

mission or integrity." *Id.*, ¶ 124.  On January 14, 2022, two chains of emails regarding

Professor Lenz's email were sent to President Fujii.  *See id.*, ¶¶ 128–29.  The first chain

of emails included the associate vice president's response and other email responses

expressing disagreement with the opinions in Professor Lenz's email.  *Id.*, ¶ 128.  In the

other email chain, one of Professor Lenz's colleagues stated that Professor Lenz had

previously engaged ACC community members in thought-provoking discussions that

served to calm community tensions.  *Id.* at 20–21, ¶¶ 129–31.  He stated that he feared

the administrators were considering limiting professors' ability to send faculty-wide

emails because of Professor Lenz's email.  *Id.* at 21, ¶ 131.  President Fujii responded

to the second chain of emails by noting that limiting the ability to send all-staff emails "is

not a restriction of free speech, but you have given me some things to think about."  *Id.*,

¶ 132.

Throughout his employment at ACC, Professor Lenz delivered lectures and held

discussions on political and civic issues of interest to the ACC student body and the

public.  *Id.* at 8, ¶ 50.  Examples of Professor Lenz's lectures include: "'The Revival of

The Hippie Counterculture,' Sept. 25, 2019; 'Unity in Politics: Transcending the Liberal-

Conservative Divide,' Sept. 23, 2020; and 'Making Sense of the Capitol Siege,' Feb. 17,

2021."  *Id.* at 9, ¶ 53.

Professor Lenz planned to give a lecture titled "President Biden's Vaccine

Mandate and the Loss of Personal Liberty" on October 26, 2021.  *Id.* at 11–12, ¶ 74.

Professor Lenz's department chair approved the lecture.  *Id.* at 12, ¶ 76.  The vice

president of student affairs contacted President Fujii about the flyer for the proposed

lecture.  *Id.*, ¶ 80.  The vice president of student affairs told President Fujii that "[w]e

often get other faculty who complain that his 'talks' do not move the institution forward educationally and are irresponsible and damaging to students." *Id.* at 13, ¶ 82. On October 5, 2021, Professor Lenz's division dean contacted him about the flyer for the proposed lecture. *Id.*, ¶ 88. The dean informed Professor Lenz that the ACC administration opposed the title and content of Professor Lenz's lecture and that the lecture "probably conflicted" with the college's vaccine agenda. *Id.* at 13–14, ¶ 89. After back-and-forth communications between the dean, Professor Bamford, and Professor Lenz, Professor Lenz decided to cancel the lecture. *Id.* at 16, ¶ 104.

In February 2022, Professor Lenz began planning a lecture titled "The Dangers of Social Justice in Higher Ed." *Id.* at 23, ¶ 146. In his description of the proposed lecture, Professor Lenz stated that, "[t]hough well-intentioned, the vast majority of college administrations today are pushing an extreme left-wing political agenda upon faculty and students through 'diversity,' 'inclusion' and 'equity' initiatives." *Id.*, ¶ 147. The description states that the dangers of the "social justice" ideology include "[t]he reinforcement of racial, gender and ethnic divisions through misguided policies that seek to redress past instances of discrimination through shaming and excluding anyone deemed as part of an 'oppressor class.'" *Id.* On February 24, 2022, ACC's leadership team, including President Fujii and Vice President Calhoun, met and discussed Professor Lenz's proposed "Dangers of Social Justice" lecture. *Id.* at 24–25, ¶¶ 152–63. At the meeting, the executive director of equity and inclusion informed ACC leadership that she had received a significant number of comments from across the college expressing concern that ACC would allow Professor Lenz to give the lecture.

*Id.* at 24, ¶ 155.  President Fujii described the discussion about Professor Lenz's lecture as a "difficult conversation."  *Id.* at 25, ¶ 163.

On February 28, 2022, Professor Lenz's dean notified his supervisor that Vice President Calhoun had determined that Professor Lenz was being given an "alternative course assignment" in lieu of teaching a late-start class.  *Id.*, ¶ 164.  The alternative assignment required Professor Lenz to "[d]evelop and complete a professional development plan focused on developing skills for online learning and equity-minded teaching" and to spend 90 hours on the assignment.  *Id.*, ¶ 165.  In communications with the dean, Professor Lenz indicated that the alternative assignment was unprecedented because he had never heard of an ACC professor being directed to complete a diversity, equity, and inclusion-focused alternative assignment instead of teaching courses in their subject.  *Id.* at 26, ¶ 172.  The dean told Vice President Calhoun that Professor Lenz had referred to her and other ACC administrators as "out of control equity warriors."  *Id.* at 27, ¶ 177.

On March 8, 2022, Professor Lenz delivered the "Dangers of Social Justice" lecture.  *Id.* at 29, ¶ 195.  On March 10, 2022, Professor Monica Fuglei emailed President Fujii and Vice President Calhoun with grievances about Professor Lenz's lecture.  *Id.* at 30, ¶ 206.  In her email, Professor Fuglei stated that

> While it will be difficult to repair harm caused on 3/8, I think that three specific steps can help ACC address the damage done by Professor Lenz's presentation. First, a definitive process must be created for events using ACC resources that aligns with institution and department missions and values.  Second, if possible, we should capture the names of students present at the 3/8 event and reach out to them in a follow up communication to ensure they are supported and feel protected on campus.  Finally, the slander aimed Javon Brame and Quill Phillips must be addressed and our institution should support them in the ways they need to be affirmed and supported.

7

*Id.* at 31, ¶ 214.  Vice President Calhoun responded to Professor Fuglei's email by stating

> I agree with your recommendations below.  I'd like to assemble a task force of faculty to work on developing a procedure for determining whether an event qualifies as an official ACC event and thus use of official college resources.  I also would like to propose we need to develop a more definitive description of what qualifies as service to the college by our faculty.

*Id.* at 31–32, ¶ 215.  President Fujii responded to Professor Fuglei's email by stating "[i]t saddens me to hear of harm.  I encourage you to work with Cheryl, as I am hopeful about their ideas and believe you can provide meaningful contributions."  *Id.* at 33, ¶ 223.

On April 28, 2022, Vice President Calhoun emailed Professor Bamford and Professor Lenz regarding a lecture Professor Lenz intended to give titled "Self-Empowerment, Spiritual Growth and the Pursuit of [T]rue Diversity: A New Vision for Higher Education."  *Id.* at 38, ¶¶ 262, 267.  Vice President Calhoun told Professor Lenz that his lecture did not qualify as a "Pathways" event because it had not been through the Pathways committee.  *Id.* at 38–39, ¶ 268.  Vice President Calhoun instructed Professor Lenz to include the following language as part of the promotional materials and lecture:

> The content contained in this document is not an official College publication and does not represent the views or official position of the College.

> The content of this presentation and the viewpoints shared are my own individual viewpoints and do not represent the views or official position of the College.

*Id.* at 39, ¶ 269.  On May 4, 2022, Professor Lenz delivered the "New Vision for Higher Education" lecture.  *Id.*, ¶ 272.  The flyer for the lecture included a description stating that "higher education has been radicalized by a divisive and disempowering political

ideology that under the guise of 'diversity, equity, and inclusion' promotes a world view of 'oppressors' and 'the oppressed.'" *Id.* at 39–40, ¶ 273. The flyer also stated that, "[a]ccording to Professor Michael Lenz, both students and faculty would be better served if college administrations pursued a more unifying and uplifting vision for higher education that emphasizes personal empowerment, spiritual growth, and a deeper understanding of diversity that sees beyond all our external differences and honors our multiple paths to self-discovery." *Id.* President Fujii and Vice President Calhoun knew that Professor Lenz delivered the "New Vision for Higher Education" lecture on May 4, 2022. *Id.* at 40, ¶¶ 275–76.

At the time Vice President Calhoun recommended that ACC not renew Professor Lenz's contract, she had never conducted a review of Professor Lenz's performance as a professor. *Id.* at 42, ¶ 289. Instead, her knowledge of Professor Lenz's teaching was limited to the information contained in Professor Bamford's positive recommendation and suggestion that Professor Lenz's contract be renewed. *Id.*, ¶ 290. When Vice President Calhoun recommended that ACC terminate Professor Lenz, she had communicated with ACC faculty and administrators who opposed Professor Lenz's speech. *Id.*, ¶ 295.

At the time President Fujii decided not to renew Professor Lenz's contract, she had been employed by ACC for ten months. *Id.* at 45, ¶ 313. President Fujii never conducted a review of Professor Lenz's performance as a professor. *Id.*, ¶ 315. Rather, her knowledge of Professor Lenz's teaching was limited to the information contained in Professor Bamford's positive recommendation and suggestion that Professor Lenz's contract be renewed. *Id.*, ¶ 316. At the same time, President Fujii

was aware that Professor Lenz had a history of giving public lectures on controversial topics, and she had communicated with ACC faculty and administrators who opposed Professor Lenz's speech.  *Id.* at 45–46, ¶¶ 320–21.

On May 2, 2024, Professor Lenz filed suit against President Fujii and Vice President Calhoun for the non-renewal of his contract in the District Court for the County of Arapahoe, Colorado.  Docket No. 1-1.  On June 20, 2024, defendants removed the action to federal court.  Docket No. 1.  On August 8, 2024, Professor Lenz filed an amended complaint.  Docket No. 19.  In the amended complaint, Professor Lenz brings one claim under 42 U.S.C. § 1983 against Vice President Calhoun in her individual and official capacities.  *Id.* at 48–51, ¶¶ 343–69.  Professor Lenz alleges that Vice President Calhoun's recommendation not to renew his contract was retaliation for speech protected by the First Amendment of the United States Constitution.  *Id.*  Professor Lenz brings one claim under 42 U.S.C. § 1983 against President Fujii in her individual and official capacities.  *Id.* at 51–54, ¶¶ 370–98.  Professor Lenz alleges that President Fujii's decision not to renew his contract was retaliation for speech protected by the First Amendment.  *Id.*

On August 22, 2024, defendants filed a motion to dismiss Professor Lenz's complaint.  Docket No. 27.  Defendants maintain that Professor Lenz's claims should be dismissed because he fails to plausibly allege that defendants violated his First Amendment rights.  *Id.* at 1–10.  They argue that Professor Lenz's claims against defendants in their official capacities should be dismissed because he has not identified a municipal policy that was the moving force behind his alleged constitutional violations.

*Id.* at 10–15.  Professor Lenz responded on September 12, 2024.  Docket No. 28.  On September 26, 2024, defendants replied.  Docket No. 29.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  A court, however, does not need to accept conclusory allegations.  *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then

11

plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted).

Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still

must contain either direct or inferential allegations respecting all the material elements

necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at

1286 (alterations omitted).

### III.  ANALYSIS

#### A.  <u>First Amendment Violation</u>

"[P]ublic employees do not surrender *all* their First Amendment rights by reason

of their employment." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (quoting

*Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).  Rather, "the First Amendment protects

a public employee's right . . . to speak as a citizen addressing matters of public

concern." *Id*. (quoting *Garcetti*, 547 U.S. at 417).  "The government employer, however,

also has a 'countervailing interest in controlling the operation of its workplaces.'" *Id*.

(quoting *Lane v. Franks*, 573 U.S. 228, 236 (2014)).  "The problem in any case is to

arrive at a balance between the interests of the employee, as a citizen, in commenting

upon matters of public concern and the interest of the State, as an employer, in

promoting the efficiency of the public services it performs through its employees." *Id*.

(quoting *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568

(1968) (internal alterations omitted)).

"In striking this balance, the First Amendment prohibits public employers from

taking adverse action against employees because of their protected speech." *Id*. at

945.  "To determine if an employer's adverse employment action against an employee

is an impermissible retaliation under the First Amendment, [courts] apply the

*Garcetti/Pickering* test." *Id*. (citing *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir.

2014); *Garcetti*, 547 U.S. at 421; *Pickering*, 391 U.S. at 568); *see also Joritz v. Gray-Little*, 822 F. App'x 731, 738 (10th Cir. 2020) (unpublished); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022). The *Garcetti/Pickering* test has five elements:

1. The protected speech was not made pursuant to an employee's official duties.

2. The protected speech addressed a matter of public concern.

3. The government's interests as an employer did not outweigh the employee's free-speech interests.

4. The protected speech was a motivating factor in the adverse employment action.

5. The defendant would not have made the same employment decision in the absence of the protected speech.

*Lincoln v. Maketa*, 880 F.3d 533, 538 (10th Cir. 2018) (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)); *see also Joritz*, 822 F. App'x at 738; *Knopf*, 884 F.3d at 945; *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1221 (10th Cir. 2017). "The first three elements are issues of law for the court to decide, while the last two are factual issues typically decided by the jury." *Knopf*, 884 F.3d at 945 (quoting *Trant*, 754 F.3d at 1165).

Defendants challenge only the fourth element, whether Professor Lenz's complaint plausibly alleges that his speech was a motivating factor in defendants' decision not to renew his contract. Docket No. 27 at 1–2 ("Defendants move to dismiss both the personal and official capacity claims against each Defendant because Plaintiff has failed to plead facts sufficient to establish a causal connection between his protected speech and the decision not to offer him a permanent faculty position.").

Therefore, the Court will consider only whether the allegations in the complaint plausibly allege the fourth element of the *Garcetti/Pickering* test.

"Under the fourth-prong of *Garcetti,* plaintiffs bear the burden of establishing both a detrimental employment decision (adverse employment action) and 'causation – that is, that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment.'" *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1236 (10th Cir. 2009) (citing *Maestas v. Segura,* 416 F.3d 1182, 1188 & n.5 (10th Cir. 2005)). "What constitutes a substantial motivating factor evades precise definition." *Maestas*, 416 F.3d at 1188. An employee "need not prove that his speech was the sole reason for defendants' action." *Copp v. Unified Sch. Dist. No. 501,* 882 F.2d 1547, 1553 (10th Cir. 1989). "Nor is the employee required to show 'but-for' causation; that is, to demonstrate but-for the employee's speech the subsequent employment action would not have occurred." *Maestas*, 416 F.3d at 1188 (citing *Spiegla v. Hull,* 371 F.3d 928, 941–43 (7th Cir. 2004)). "Rather, the employee must show the protected speech played a substantial part in the employer's decision to adversely alter the employee's conditions of employment." *Id.* (emphasis omitted).

Although "protected conduct closely followed by adverse action may justify an inference of retaliatory motive, the mere temporal proximity of Plaintiff's protected speech to the adverse action is insufficient, without more, to establish retaliatory motive." *Couch*, 587 F.3d at 1236 (quoting *Baca v. Sklar,* 398 F.3d 1210, 1221 (10th Cir. 2005)). "It might be relevant in establishing a retaliatory motive that 'the employer expressed opposition to the employee's speech,' . . . or that 'the protected speech

implicated the individual defendant in wrongdoing.'"  *Id.* (quoting *Maestas,* 416 F.3d at 1189; *Baca,* 398 F.3d at 1221).  However, "evidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link."  *Id.* (quoting *Maestas,* 416 F.3d at 1189).

Defendants argue that, "[a]lthough Plaintiff alleges facts to support his claim that he engaged in protected speech (giving lectures) and suffered an adverse employment action (nonrenewal of his contract), he fails to allege sufficient facts to support a critical aspect of his claim: causal connection."  Docket No. 27 at 6.  Defendants assert that Professor Lenz's complaint identifies three instances of protected speech that allegedly motivated defendants' decision not to offer Professor Lenz a permanent teaching position, namely, his email regarding ACC's response to the COVID-19 pandemic, his "Dangers of Social Justice" lecture, and his "New Vision for Higher Education" lecture. *Id.* at 8 (citing Docket No. 19 at 48–54, ¶¶ 343–98).  Defendants maintain that Professor Lenz's complaint alleges only that other faculty disagreed with the viewpoints expressed in Professor Lenz's email and lectures.  *Id.*  They assert that the complaint does not include any indication that defendants disagreed with Professor Lenz's opinions or that his speech motivated their decision not to renew his contract.  *Id.*

Professor Lenz responds that, even though his complaint does not allege direct evidence of defendants' retaliatory motive, it alleges sufficient circumstantial evidence that his speech was a motivating factor in defendants' decision not to renew his contract.  Docket No. 28 at 4 (citing *Ware v. Unified Sch. Dist.*, 881 F.2d 906, 911 (10th Cir. 1989) ("Evidence on the motivating factor issue may be sufficient to support a jury

verdict even though it is circumstantial.")).  Professor Lenz argues that "the close temporal proximity between the speech, particularly the 'New Vision for Higher Education' lecture, and the adverse action, is sufficient evidence to establish causation, *i.e.*, that the nonrenewal recommendation and decision was motivated by Professor Lenz's speech."  *Id.* at 11.

Defendants reply that Professor Lenz's arguments regarding temporal proximity are undercut by the fact that the review of whether Professor Lenz would be offered a permanent position was set at the end of Professor Lenz's third year of teaching. Docket No. 29 at 2–3 ("Plaintiff began his employment in the fall semester of 2019, meaning his contract was scheduled for review at the end of the 2022 academic year." (citing Docket No. 19 at 7, ¶¶ 39–41)).  As such, they claim that nothing about the timing of Professor Lenz's termination could give rise to the inference that his speech was a motivating factor in the non-renewal of his contract.  *Id.* at 3 ("there is nothing 'suspicious' about the timing of ACC's review of Plaintiff's contract and Plaintiff cannot rely on temporal proximity to establish a causal connection").  Defendants assert that Professor Lenz's reliance on the proximity of his termination to his "New Vision for Higher Education" lecture is further undercut by the fact that Professor Lenz had given lectures on controversial topics over multiple years, but he was not terminated until the end of his probationary teaching period.  *Id.*

The Court does not agree that, because defendants' decision not to renew Professor Lenz's contract occurred on a predetermined date, there can be no inference that Professor Lenz's speech was a motivating factor in the adverse employment decision.  Professor Lenz's First Amendment claim is based on protected speech he

engaged in during his final semester at ACC.  *See* Docket No. 19 at 18, ¶ 118.

Professor Lenz's email criticizing ACC's response to the COVID-19 pandemic was sent

on January 13, 2022.  *Id.*, ¶ 119.  On March 8, 2022, Professor Lenz delivered the

"Dangers of Social Justice" lecture.  *Id.* at 29, ¶ 195.  On May 4, 2022, Professor Lenz

delivered his "New Vision for Higher Education" lecture.  *Id.* at 39, ¶ 272.  On May 12,

2022, Vice President Calhoun recommended that Professor Lenz's teaching contract

not be renewed, and President Fujii accepted the recommendation the same day.  *Id.* at

41, 47, ¶¶ 285, 335.

      The Tenth Circuit has held that, when an adverse employment decision occurs

more than three months after a plaintiff's protected speech, the proximity of the speech

to the alleged retaliation cannot support an inference of causation by itself.  *Lauck v.

Campbell Cnty.*, 627 F.3d 805, 815 (10th Cir. 2010) ("We have repeatedly held that one

cannot infer causation from temporal proximity alone when the time lapse between the

protected activity and the retaliatory act exceeds three months."); *Clark Cnty. Sch. Dist.

v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity

between an employer's knowledge of protected activity and an adverse employment

action as sufficient evidence of causality to establish a prima facie case uniformly hold

that the temporal proximity must be 'very close.'" (citing *O'Neal v. Ferguson Const. Co.*,

237 F.3d 1248, 1253 (10th Cir. 2001) (3 months)).  However, Professor Lenz's "New

Vision for Higher Education" lecture occurred days before he was terminated, and his

"Dangers of Social Justice" lecture occurred three months and four days before his non-

renewal.  While it may have been a coincidence that defendants' non-renewal decision

occurred shortly after Professor Lenz's email and lectures, it is plausible that his emails

and lectures were the motivating reason for defendants' non-renewal decisions.
Moreover, the complaint alleges no facts to suggest that there was "a long delay
between the employee's speech and challenged conduct," *Couch*, 587 F.3d at 1236,
given that Professor Lenz's provocative email and lectures occurred throughout his final
semester.  Nor does the complaint allege facts which show that "intervening events"
weaken the causal link between Professor Lenz's speech and his termination.

Regardless of how close in time Professor Lenz's non-renewal was to his
protected speech, "the mere temporal proximity of Plaintiff's protected speech to the
adverse action is insufficient, without more, to establish retaliatory motive." *Id.*
However, in addition to temporal proximity, Professor Lenz relies on circumstantial
evidence that his speech was a motivating factor in his non-renewal.  Professor Lenz
argues that the complaint alleges defendants did not investigate Professor Lenz's
teaching qualifications, Docket No. 28 at 10, and that the defendants had only two
sources of information about Professor Lenz: (1) the complaints about his controversial
email and lectures, and (2) repeated exemplary performance evaluations and the
recommendation of his supervisor that he be retained as permanent faculty.  *Id.* at 10–
12.  Professor Lenz maintains that, because the complaint alleges that there was no
alternative basis for his termination, he has demonstrated that his email and lectures
were a motivating factor in defendants' decision not to renew his contract.  *Id.* at 12
("With the Defendants having that limited set of knowledge, it is plausible to infer that it
was Professor Lenz's speech, and not his exemplary performance, that was the
motivating factor for the nonrenewal recommendation and decision.").

The Court agrees.  The allegations in the complaint plausibly allege that

Professor Lenz's protected speech was a motivating factor in defendants' decision not

to renew his contract.  The complaint includes the following allegations.  President Fujii

became president of ACC on July 12, 2021 and Vice President Calhoun became Vice

President and Provost of ACC on February 1, 2022.  Docket No. 19 at 10, 22, ¶¶ 61,

142–43.  Professor Lenz's department chair, Professor Bamford, submitted a

recommendation that Professor Lenz be granted non-provisional status on March 7,

2022.  *Id.* at 16, 29, ¶¶ 103, 192.  On "March 28, 2022, Professor Bamford informed

President Fujii and Dr. Calhoun that past precedent at ACC for over 30 years had been

to grant non-provisional status to high performing faculty like Professor Lenz."  *Id.* at 36,

¶ 252.  Vice President Calhoun received a spreadsheet listing the provisional faculty up

for review and Professor Lenz was identified as "Non-Provisional Pending VP

Approval."  *Id.* at 33–34, ¶¶ 228–30.  President Fujii and Vice President Calhoun had no

other information about Professor Lenz's performance during his time at ACC.  *Id.* at 42,

45, ¶¶ 290, 316.

The complaint further alleges that, on January 13, 2022, Professor Lenz sent a

faculty-wide email criticizing ACC's response to the COVID-19 pandemic; that Professor

Lenz delivered the "Dangers of Social Justice" lecture on March 8, 2022; and that

Professor Lenz delivered his "New Vision for Higher Education" lecture on May 4, 2022.

*Id.* at 18, 29, 39, ¶¶ 118–19, 195, 272.  The complaint alleges that members of the ACC

community strongly opposed the viewpoints Professor Lenz expressed in his email and

lectures.  *Id.* at 18–22, 29–33, 38–41, ¶¶ 118–41, 195–225, 262–81.  Finally, the

complaint alleges that, five months after Professor Lenz sent the critical email, three

months after Professor Lenz delivered his lecture on social justice, and eight days after

Professor Lenz delivered his lecture on diversity, defendants decided not to offer him a

permanent teaching position and terminated his contract. *Id.* at 41, 47, ¶¶ 285, 335.

Taken together, the allegations in the complaint that Professor Lenz was a high-

performing professor who had been recommended for retention, but whose protected

speech had caused conflict throughout the ACC community are sufficient to plausibly

allege that Professor Lenz's protected speech was a motivating factor in defendants'

non-renewal of Professor Lenz's contract.

Defendants argue that, "[w]hile Plaintiff's lectures did prompt debate at ACC,

opposition to Plaintiff's lectures came from his colleagues" and that the complaint

"contains no allegations about how Fujii or Calhoun felt about his lectures." Docket No.

29 at 4. Defendants provide no support for the proposition that a plaintiff must allege

that the person who retaliated against the plaintiff personally disagreed with his opinions

to plausibly allege causation. Although "evidence of causation may include evidence

the employer expressed opposition to the employee's speech," *Maestas*, 416 F.3d at

1189, such evidence is not necessary to prove causation. *See Tonjes v. Park Cnty.*

*Sheriff's Off.*, 300 F. Supp. 3d 1308, 1330 (D. Colo. 2018) (citation and quotations

omitted) ("a pleading alleges facts sufficient to assert a plausible claim under the First

Amendment based upon a broad array of circumstances that include temporal

proximity, intervening antagonism or retaliatory animus, inconsistencies in the

employer's articulated reason for taking adverse action, or any other evidence of record

sufficient to support the inference of causality"). For the reasons discussed above, the

allegations in the complaint regarding the limited information from which President Fujii

and Vice President Calhoun made their non-renewal decision are sufficient to raise a plausible inference that Professor Lenz's speech was a motivating factor in his non-renewal.

Moreover, the complaint alleges that, on February 24, 2022, President Fujii and Vice President Calhoun met and discussed Professor Lenz's proposed "Dangers of Social Justice" lecture with ACC's leadership team. Docket No. 19 at 24–25, ¶¶ 152–63. It alleges that President Fujii described the discussion as a "difficult conversation." *Id.* at 25, ¶ 163. Four days after this difficult conversation, Vice President Calhoun required Professor Lenz to complete an unprecedented alternative course assignment in lieu of teaching, specifically focusing on the kind of "equity-minded teaching" Professor Lenz intended to criticize in his "Dangers of Social Justice" lecture. *Id.*, ¶¶ 164–65. Finally, in responding to an email critical of Professor Lenz's "Dangers of Social Justice" lecture that recommended limiting institutional support for speech like Professor Lenz's lecture, following up with students who may have disagreed with Professor Lenz's views, and addressing as an institution Professor Lenz's criticism of Javon Brame and Quill Phillips, Vice President Calhoun stated, "I agree with your recommendations." *Id.* at 31–32, ¶¶ 214–15. Similarly, President Fujii encouraged the critical professor to work with Vice President Calhoun to address the alleged harm cause by Professor Lenz's speech. *Id.* at 33, ¶ 223. Taken together, defendants' commitment to creating a definitive process to ensure events receiving ACC resources align with ACC leadership's values, their support for institutional efforts to limit the impact of Professor Lenz's "Dangers of Social Justice" lecture, and Vice President Calhoun requiring Professor Lenz to complete an unprecedented alternative assignment

create a plausible inference that defendants disagreed with the views expressed in

Professor Lenz's lecture and imposed retaliatory academic burdens on him.  These

allegations provide further support for the inference that, because President Fujii and

Vice President Calhoun disagreed with Professor Lenz's speech, his speech was a

motivating factor in Professor Lenz's non-renewal.  Therefore, defendants' argument

that the complaint contains no allegations regarding how President Fujii and Vice

President Calhoun felt about Professor Lenz's speech is incorrect.  The Court will deny

that portion of defendants' motion seeking to dismiss Professor Lenz's claims in

defendants' individual capacities.

### B. Municipal Liability

Defendants argue that, even if Professor Lenz has plausibly alleged that

defendants violated his First Amendment rights, Professor Lenz's claims against

defendants in their official capacities should be dismissed because the complaint does

not show that his termination was made pursuant to an unconstitutional policy not to

renew probationary professors' contracts based on their speech.  Docket No. 27 at 10.

"A claim against a public employee in his official capacity is the same as

asserting a claim against the municipality or county."  *Weiss v. Vasquez*, No. 21-cv-

01533-CNS-NRN, 2023 WL 142531, at *2 (D. Colo. Jan. 10, 2023) (citing *Johnson v.

Bd. of Cnty. Comm'rs for Cnty. of Fremont*, 85 F.3d 489, 493 (10th Cir. 1996)), *aff'd sub

nom. Weiss v. Town of Elizabeth*, 2023 WL 6389042 (10th Cir. Oct. 2, 2023).

Municipalities may not be sued under 42 U.S.C. § 1983 on a theory of respondeat

superior for the actions of their employees.[2]  *Monell v. Dep't of Soc. Servs. of N.Y.,* 436

---

[2] The parties accept that ACC is subject to municipal liability, and the Court will
assume the same.  Docket No. 27 at 10; Docket No. 28 at 12.

U.S. 658, 692 (1978). Instead, local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. at 690. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694.

To state a claim of municipal liability under § 1983 for the actions of municipal employees, a plaintiff must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employees committed a constitutional violation and (2) that a municipal policy or custom was the moving force behind the deprivation of rights. *See Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). A municipal policy or custom can take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Defendants argue that Professor Lenz's complaint does not identify a formal policy that was the moving force behind the defendants' violation of his First Amendment rights. Docket No. 27 at 11. They assert that the complaint also fails to identify other instances of ACC professors being retaliated against for their speech. *Id*.

at 12.  Defendants maintain that the complaint therefore does not include allegations

which demonstrate that ACC had an informal custom or practice of violating professors'

First Amendment rights.  *Id.*  In his response, Professor Lenz does not rebut

defendants' arguments that he cannot demonstrate municipal liability based on a formal

or informal policy.  *See* Docket No. 28 at 12–15.  Instead, Professor Lenz argues that

President Fujii and Vice President Calhoun were final policymakers such that their

decisions can be considered the official policy of ACC.[3]  Docket No. 27 at 13.

Courts look to state and local law to determine whether an official has final

policymaking authority.  *Jackson v. City & Cnty. of Denver*, 2022 WL 120986, at *4 (10th

Cir. Jan. 13, 2022) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) ("the

identification of policymaking officials is a question of state law"); *Ledbetter v. City of

Topeka*, 318 F.3d 1183, 1189 (10th Cir. 2003) ("in identifying final municipal

policymakers, the courts must examine state laws and local ordinances or regulations to

determine where the statutory law places the responsibility for making law or setting

policy in a particular area")).  "This determination may be made on [a] motion to

dismiss."  *Smith v. USD 480 Liberal*, 682 F. Supp. 3d 980, 991 (D. Kan. 2023).  In

undertaking this inquiry, courts "are interested only in delegations of legal power."

*Milligan-Hitt v. Bd. of Trs. of Sheridan Cnty. Sch. Dist. No. 2*, 523 F.3d 1219, 1227 (10th

Cir. 2008) (emphasis omitted).

---

[3] The Court notes that neither the complaint nor Professor Lenz's response
suggests that Professor Lenz's claims against defendants in their official capacities are
based on a ratification or a failure to train theory.  *See* Docket No. 19; Docket No. 28.
Therefore, the Court will not consider these theories.

When considering state and local law, "three factors help [courts] decide whether
an individual is legally a final policymaker for a municipality: (1) whether the official is
meaningfully constrained by policies not of that official's own making; (2) whether the
official's decisions are final – i.e., are they subject to any meaningful review; and (3)
whether the policy decision purportedly made by the official is within the realm of the
official's grant of authority." *Jackson*, 2022 WL 120986, at *4 (alterations omitted)
(quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir.
2010) (citation and quotation omitted)); *see also Patel v. Hall*, 849 F.3d 970, 979 (10th
Cir. 2017).

Defendants maintain that the State Board of Community Colleges and
Occupational Education sets the policies that govern community colleges in Colorado,
including ACC.  Docket No. 27 at 2, 13.  Defendants state that Board policies, including
BP 3-20, govern the contract rules for provisional and non-provisional professors.  *Id.* at
13.  Moreover, defendants claim that Board policies are ultimately promulgated by the
"system president" and that he is the individual with final policy-making authority.  *Id.*
Because the complaint does not include allegations that Professor Lenz's non-renewal
decision was made by the system president, defendants assert that Professor Lenz has
not plausibly alleged that his termination constituted a decision by an employee with
final policymaking authority.  *Id.* at 14.

Defendants and Professor Lenz both rely on BP 3-20 as the relevant Board
policy in this case, which is the Board policy governing the non-renewal of teaching
contracts.  *See* Docket No. 27 at 13 (citing Docket No. 27-1); Docket No. 28 at 14 (citing
Docket No. 27-1); *see also* State Bd. For Cmty. Colls. & Occupational Educ., Due

Process for Faculty, BP 3-20 (Revised 2022).[4]  BP 3-20 defines "non-renewal" as the "[f]ailure or refusal to offer to an employee a new contract of employment for the subsequent year."  Docket No. 27-1 at 3.  The policy defines the "president" as the "chief executive officer of a state system community college."  *Id.*  BP 3-20 provides that a "provisional employee shall be non-renewed at the end of the provisional period unless the college president approves removal from provisional status."  *Id.* at 4.  Furthermore, a "provisional employee's contract may be non-renewed without cause at the end of any contract" or a "non-provisional employee's contract may be non-renewed on grounds of below standard evaluations for two consecutive years."  *Id.*  Finally, BP 3-20 states that "[t]here shall be no review of non-renewal of a provisional employee's contract."  *Id.*

Professor Lenz argues that he has pled facts that demonstrate that President Fujii was a final policymaker regarding his non-renewal.[5]  Docket No. 28 at 12–13.

---

[4] The "question of whether an official has 'final policymaking authority' is a question of state law."  *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995).  "Although for the purposes of a motion to dismiss [courts] must take all of the factual allegations in the complaint as true, [courts] are not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (internal quotations and citation omitted).  The Court can consider Colorado law, including Board policies, to resolve the legal question of whether defendants were final policymakers on a motion to dismiss.  *See, e.g., Espinosa Hernandez v. Bd. of Cnty. Commissioners of Okla. Cnty.*, 2019 WL 3069430, at *6 (W.D. Okla. July 12, 2019) (considering whether defendant was a final policymaker on a motion to dismiss); *Doe v. Burleson Cnty., Tex.*, 86 F.4th 172, 175 (5th Cir. 2023) (same); *Melendres v. Arpaio*, 598 F. Supp. 2d 1025, 1038 (D. Ariz. 2009) (same).

[5] Professor Lenz does not respond to defendants argument that Vice President Calhoun was not a final policymaker.  *See* Docket No. 28.  He also does not identify a policy that was the moving force behind Vice President Calhoun's recommendation not to renew Professor Lenz's contract.  *See id.*  Therefore, Professor Lenz has failed to state his First Amendment retaliation claim against Vice President Calhoun in her official capacity.  *Jiron*, 392 F.3d at 419 (to state a claim of municipal liability under § 1983, a plaintiff must allege that a municipal policy or custom was the moving force behind the

Professor Lenz highlights the allegations in his complaint that claim that President Fujii's decision not to renew his contract was unreviewable. *Id.* at 14 (citing Docket No. 19 at 4–6, ¶¶ 15–17, 22–23, 26–28). Moreover, Professor Lenz argues that BP 3-20 was issued pursuant to Colo. Rev. Stat. § 23-5-117, which authorizes the "governing board of any state-supported institution of higher education . . . [to] delegate all or part of its power over personnel matters, including the power to hire or to fire employees exempt from the personnel system, to the chief executive officer of the institution governed by such board." *See id.* at 14 (citing *Craddock v. State Bd. for Cmty. Colls. & Occupational Educ.,* 768 P.2d 716, 717–18 (Colo. App. 1988) (noting "that § 23-5-117, C.R.S., enacted in 1985, now expressly allows the board to delegate personnel matters to the college presidents."). Finally, Professor Lenz argues that his complaint alleges that "the State Board intended for individual college presidents to have broad authority over all personnel actions and that the State Board delegated to the President of ACC the authority to approve all personnel actions." *Id.* He claims that these allegations demonstrate that President Fujii was the ACC employee with final policy-making authority for purposes of the non-renewal of his contract. *Id.* at 14–15.

However, the "relevant question is not whether an employee had final 'decision-making' authority, it is whether an employee had final 'policymaking' authority." *USD 480 Liberal*, 682 F. Supp. 3d at 992; *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) ("[J]ust because Owen makes personnel decisions does not necessarily mean that he is the *final* decisionmaker on such matters such that he can

---

deprivation of rights). The Court will dismiss Professor Lenz's first claim for relief against Vice President Calhoun in her official capacity.

be considered a policymaker for the Village in this area.  It is a 'well-established

principle that the mere unreviewed discretion to make hiring and firing decisions does

not amount to policymaking authority.  There must be a delegation of authority to set

policy for hiring and firing, not a delegation of only the final authority to hire and fire.'"

(quoting *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty., Ind.*, 183 F.3d 734, 739 (7th

Cir. 1999) (quotations omitted)).

The allegations in the complaint and the policy statements in BP 3-20

demonstrate only that President Fujii had final decision-making authority as to whether

Professor Lenz's contract would be renewed.  Other Board policies make clear that

President Fujii did not have policy-making authority.  Although Professor Lenz is correct

that the Board policy regarding its delegation of authority over personnel matters

indicates that "[i]t is the intent of the Board that the System Chancellor and College

Presidents be afforded broad authority within their respective institutions," BP 3-5 states

that the president's personnel decisions are "subject to Board Policies, System

Procedures, State of Colorado Department of Personnel and Administration (DPA)

Personnel Rules, and other pertinent laws, regulations and guidance."  State Bd. for

Cmty. Colls. & Occupational Educ., Delegation of Personnel Authority, BP 3-5 (Revised

2020).  Nothing in the delegation of authority indicates that the Board has delegated to

college presidents the authority to set official policy.  *See id.*  Therefore, although the

allegations in Professor Lenz's complaint plausibly allege that President Fujii was acting

within the realm of her authority when she decided not to renew his contract, Professor

Lenz has not plausibly alleged that President Fujii was not "meaningfully constrained by

policies not of [her] own making" or that her decision not to renew his contract was a

"policy decision" rather than an employment decision.  *Jackson*, 2022 WL 120986, at *4.
Accordingly, the complaint does not plausibly allege that the Board's delegation to
President Fujii was "such that [s]he can be considered a policymaker for the [Board] in
this area."  *Valentino*, 575 F.3d at 676.

Professor Lenz's complaint fails to identify a municipal policy that was the moving
force behind President Fujii's alleged retaliation.  Therefore, Professor Lenz does not
plausibly state his § 1983 claim against President Fujii in her official capacity.  *Jiron*,
392 F.3d at 419 (to state a claim of municipal liability under § 1983, a plaintiff must
allege that a municipal policy or custom was the moving force behind the deprivation of
rights).  Because Professor Lenz does not state a claim of municipal liability against
either defendant, the Court will dismiss Professor Lenz's claims against defendants in
their official capacities.

## IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants' Motion to Dismiss First Amended Complaint [Docket
No. 27] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that plaintiff's claims against defendants Stephanie Fujii and Cheryl
Calhoun, in their official capacities, are **DISMISSED with prejudice**.

DATED March 19, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge